1  **EDWARD A. KUNNES** (SBN 160632)
   100 N. Wiget Lane, Suite 150
2  Walnut Creek, CA 94598
   Telephone:   (925) 930-9550
3  Facsimile:   (925) 930-9588

4  Attorneys for Plaintiff
   **Fidelity National Title Company**

**FILED**

2009 APR -6  AM 10: 05

U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
OAKLAND, CA.

## UNTIED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| In re:<br><br>TINA LOUISE DUNCAN,<br><br>    **Debtor.**<br><br>_____/<br><br>**FIDELITY NATIONAL TITLE COMPANY,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**TINA LOUISE DUNCAN,**<br><br>    **Defendant.**<br><br>_____/ | Bk. No. 09-40135<br><br>Adv. Case No.<br><br>Chapter 7<br><br>**COMPLAINT TO DEEM DEBT EXCEPTED FROM DISCHARGE**<br>[11 U.S.C. §523(a)(2)(A); (A)(2)(B); (4); and (6)] |

Plaintiff, Fidelity National Title Company alleges as follows:

### GENERAL ALLEGATIONS

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and 11 U.S.C. §523(a).

2.  Fidelity National Title Company is and was at all relevant times a corporation, duly authorized to carry out business within the State of California.

3.  The claim upon which this action is based arose within the Northern District of

-1-

Complaint for Nondischargeability

California and therefore, the claim is within the jurisdiction of this Court.

4. Fidelity National Title Company alleges on information and belief that Tina Louise Duncan ("Tina L. Duncan") is and at all times mentioned herein was a resident within the Northern District of California, the Oakland Division who resides at 5835 Seminary Court, Oakland, CA 94605. Debtor filed this Chapter 7 bankruptcy petition on January 9, 2009. The deadline to file a complaint objecting to discharge of Tina L. Duncan or to determine dischargeability of certain debts is April 6, 2009. This action is timely filed under Bankruptcy Rule 4007.

## FIRST CAUSE OF ACTION

### (Embezzlement and Willful and Malicious Injury: 11 U.S.C. §523(a)(4) and (6))

5. Fidelity National Title Company hereby refers to and incorporates herein paragraphs 1 through 4, inclusive, as though set forth in full herein.

6. On or about January 5, 2006, as part of an escrow numbered 06-161572, Fidelity National Title Company was the escrow holder for the refinance of the real property by borrower Tina L. Duncan for a loan from lender SRI Mortgage. The escrow was opened to enable Tina L. Duncan to secure a first deed of trust in favor of SRI Mortgage against the property being commonly known as 10623-10625 Graffian Street, Oakland, CA (hereinafter the "Property") for a loan in the amount of $612,000.00.

7. Tina L. Duncan warranted that she had read the Preliminary Report covering the Property, and that she knew of no other matters pertaining to the condition of title other than what was stated in the report. A copy of the Preliminary Report Approval and Preliminary Report appearing as and presented as one package to Tina L. Duncan are attached hereto as Exhibit "1."

8. Prior to the time that the escrow closed but during the pendency of the Fidelity National Title Company escrow, Tina L. Duncan encumbered the Property with a trust deed in favor of Ameriquest Mortgage, recorded on March 31, 2006, in the County Recorder's Office for Alameda County, securing a promissory note in the amount of $576,000.00. This refinance was undertaken at Town and Country Title Services. A copy of the Ameriquest Mortgage Deed of Trust is attached hereto as Exhibit "2."

-2-

Complaint for Nondischargeability

9.     At no time during the pendency of the Fidelity National Title Company escrow did Tina L. Duncan tell the lender SRI Mortgage or Fidelity National Title Company that she was obtaining a new refinance through Ameriquest Mortgage for a senior lien against the Property. Tina L. Duncan instructed Fidelity National Title Company in the Borrower's Escrow Instructions, specifically in the Estimated Closing Statement, to payoff Chase's loan. Notwithstanding the fact that she had satisfied the Chase's loan through her refinance at Town and Country Title Services with Ameriquest Mortgage loan proceeds. A copy of the Borrower's Escrow Instructions is attached hereto as Exhibit "3."

10.     The proceeds were returned by the Chase to the escrow account. Fidelity National Title Company, unaware of the new Ameriquest Mortgage loan, directed $505,221.54 to Tina L. Duncan from the escrow proceeds. Thereafter, Fidelity National Title Company was informed that the secured obligation owed to Ameriquest Mortgage remained outstanding against the Property. A copy of the wire out request to Tina L. Duncan's bank account is attached hereto as Exhibit "4."

11.     On or about May 2, 2006, Tina L. Duncan took the property described above in the form of wired funds from Fidelity National Title Company and converted the same to her own use. At the time, Tina L. Duncan took the property she was aware that she was not entitled to possession of the property and thereby became the trustee to the one justly entitled to it. *People v. Newman*, 49 Cal.App.3d 426, 431 (1975); *citing to People v. Durbin*, 232 Cal.App.2d 674 (1965), <u>See also</u>, Penal Code sections 503 and 504b.

12.     Tina L. Duncan, as the constructive trustee of the funds, intentionally retained those funds knowing that she was not entitled to possession of those funds and did so willfully and maliciously to the injury of Fidelity National Title Company.

13.     On or about February 11, 2009, Fidelity National Title Company demanded the immediate return of the above-mentioned property through an attempt to make service of a state

Complaint for Nondischargeability

1  court lawsuit on Tina L. Duncan at 5835 Seminary Court, Oakland, CA 94605. [1] Fidelity National

2  Title Company only became aware of this bankruptcy filing on March 17, 2009.

3      13. As a proximate result of Tina L. Duncan's embezzlement, Fidelity National Title

4  Company suffered damages in the sum of $505,221.54, together with interest at the legal rate of

5  10% per annum, or $138.45 per diem, from and after May 2, 2006.

6                           **SECOND CAUSE OF ACTION**

7              (Money Obtained through False Pretenses §523 (a)(2)(A) and (B))

8      14.    Fidelity National Title Company hereby refers to and incorporates herein

9  paragraphs 1 through 13, inclusive, as though set forth in full hereinbelow.

10     15.    The aforementioned conduct of Tina L. Duncan, by intentionally failing to disclose

11 the Ameriquest Mortgage deed of trust when specifically asked to identify other matters of record

12 not appearing on the Preliminary Report, was a false pretense, a false representation and an actual

13 fraud by which she obtained money.

14     16.    Additionally, Tina L. Duncan's use of the Borrower's Escrow Instructions

15 directing payment to the lender she had satisfied through a nearly simultaneous escrow at a

16 different escrow company was materially false respecting her financial condition on which

17 Fidelity National Title Company reasonably relied to close the transaction.  Tina L. Duncan

18 caused the Borrower's Escrow Instructions to be published with intent to deceive and it in fact

19 did deceive Fidelity National Title Company.

20     17.    Pursuant to the relevant terms of the escrow instruction, Fidelity National Title

21 Company was compelled to advance the funds to pay the pre-existing obligation encumbering the

22 real property senior to SRI Mortgage's Trust Deed so as to avoid a foreclosure sale by Ameriquest

23 Mortgage's successor, Citi Residential Lending.  A copy of the check that Fidelity National Title

24 Company paid to Citi Residential Lending to prevent foreclosure of the property on SRI

25 Mortgage's Trust Deed is attached hereto as Exhibit "5."

26

27  _____

28     [1] Fidelity National Title Company was apparently incorrectly informed that Tina L. Duncan is not
    at the above address based on her bankruptcy filing.

                           -4-                Complaint for Nondischargeability

18.     Under its contractual obligation, Fidelity National Title Company paid the remaining obligation in the amount of $604,114.99 to Citi Residential Lending on or about December 11, 2008. The amount currently owed to Fidelity National Title Company by the Defendants is $604,114.99, plus interest at the legal rate from December 11, 2008.

18.     The fraud damaged Fidelity National Title Company in the sum of $604,114.99, together with interest thereon, at the legal rate of 10% per annum, or $165.51 per diem, from and after December 11, 2008.

WHEREFORE, Fidelity National Title Company prays judgment against the Tina L. Duncan as follows:

1.     For a judgment that debt now owed by Tina L. Duncan to Fidelity National Title Company be deemed excepted from discharge under 11 U.S.C. §523(a)(4), §523(a)(6), §523(a)(2)(A) and §523(a)(2)(B);

2. For judgment that Tina L. Duncan pay to Fidelity National Title Company the sum she has wrongfully retained in the amount of $505,221.54;

3. For interest at the legal rate of 10% per annum, or $138.45 per diem, from and after May 2, 2006;

4. For judgment that Tina L. Duncan pay to Fidelity National Title Company the sum she has damaged plaintiff by actual fraud in the amount of $604,114.99;

5. For interest at the legal rate of 10% per annum, or $165.51 per diem, on the foregoing sum from and after December 11, 2008;

6. For costs of suit herein incurred; and

7. For such other and further relief as the court may deem proper.

DATE: ___4/3/09___

EDWARD A. KUNNES
Attorney for Fidelity National Title Company

-5-                          Complaint for Nondischargeability

# Fidelity National Title Company

1999 Harrison Street, Suite 675, Oakland, CA 94612
510 893-8100 • FAX 510 893-8151

TO: Linda Barnett
Fidelity National Title Company
1999 Harrison Street, Suite 675
Oakland, CA 94612

DATE: April 18, 2006
ESCROW NO.: 06-**161572**-LB
LOCATE NO.: CAFNT0901-0901-0013-0000161572
TITLE NO.: 06-**161572**
PROPERTY ADDRESS:
10623 -10625 Graffin Street, Oakland, CA 94603

## PRELIMINARY REPORT APPROVAL

I have read the Preliminary Report dated April 20, 2006 covering the property described in your above numbered escrow. I know of no other matters pertaining to the condition of title other than stated in this report. Further we approve the legal description as being the property which is the subject of this escrow.

I hereby acknowledge receipt of a copy of said Preliminary Report.

_Tina L. Duncan_

Preliminary Report Approval – Seller (preapps)(2-01)

# Fidelity National Title Company

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Fidelity National Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Attachment One. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the Policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The Policy(s) of title insurance to be issued hereunder will be policy(s) of Fidelity National Title Insurance Company, a California corporation.*

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

*It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.*

**Fidelity National Title Company**

BY _____ President

SEAL

ATTEST _____ Secretary

Countersigned

CLTA Preliminary Report Form (11/17/04)



# Fidelity National Title Company

1999 Harrison Street, Suite 675 • Oakland, CA 94612
510 893-8100 • FAX 510 893-8151

## PRELIMINARY REPORT

**Amended**

Escrow Officer: Linda Barnett
Escrow No.: 06-**161572**-LB

Title No.: 06-**161572**-A
Locate No.: CAFNT0901-0901-0013-0000161572

TO:    Equiprime Group
500 E. Caleveras Blvd.
Milpitas, CA  95035

ATTN: Julie Yarbrough  408-262-5200

SHORT TERM RATE:  No

**PROPERTY ADDRESS:**   10623 -10625 Graffin Street, Oakland, California

**EFFECTIVE DATE: February 20, 2006, 07:30 A.M.**

The form of Policy or Policies of title insurance contemplated by this report is:

1.    THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

A Fee

2.    TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

**Tina L. Duncan, an unmarried woman**

3.    THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

RR\RR  01/10/2006

CITA Preliminary Report Form (11/17/04)

## LEGAL DESCRIPTION

### EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF OAKLAND, COUNTY OF ALAMEDA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

Lot 315, Map of Stone Orchard, Stonehurst, Alameda County, California, 1908, filed for record in the office of the County Recorder of said Alameda County on March 3rd, 1908.

APN: 045-5200-002

AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:

1.     **Property taxes**, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2006-2007.

2.     **Property taxes**, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2005-2006, Assessor's Parcel Number 045-5200-002 .

| | |
|---|---|
| Code Area Number: | 1100 |
| 1st Installment: | $3,082.52  delinquent + penalty $308.25 |
| 2nd Installment: | $3,082.52  Open— |
| Land: | $124,500.00 |
| Improvements: | $290,500.00 |
| Exemption: | |
| Personal Property: | |
| Tracer No.: | 092588-00 |

*[handwritten: Pd 4/7/06]*
*[handwritten: 4/7/06 Pd]*

3.     **The lien of supplemental taxes**, if any, assessed pursuant to the provisions of Chapter 3.5 (Commencing with Section 75) of the Revenue and Taxation code of the State of California.

4.     **Easement(s)** for the purpose(s) shown below and rights incidental thereto as reserved in a document;

| | |
|---|---|
| Reserved by: | Jennie F. Stone, and E. B. & A. L. |
| Purpose: | utilities |
| Recorded: | April 13, 1914, Instrument No. P51186, of Official Records |
| Affects: | portion of the premises |

5.     **A deed of trust** to secure an indebtedness in the amount shown below, and any other obligations secured thereby

| | |
|---|---|
| Amount: | $488,000.00 |
| Dated: | June 24, 2005 |
| Trustor: | Detra Duncan, a single woman |
| Trustee: | T.D. Service Company, a California Corporation |
| Beneficiary: | BNC Mortgage, Inc., a Delaware Corporation |
| Loan No.: | SJ00006455 |
| Recorded: | July 1, 2005, Instrument No. 2005/272645, of Official Records |

6. **A deed of trust** to secure an indebtedness in the amount shown below, and any other obligations secured thereby

| | |
|---|---|
| Amount: | $75,000.00 |
| Dated: | June 24, 2005 |
| Trustor: | Detra D. Duncan |
| Trustee: | First American Title Insurance Company |
| Beneficiary: | Tina L. Duncan |
| Loan No.: | None shown |
| Recorded: | August 10, 2005, Instrument No. 2005/341972, of Official Records |

The beneficial interest has merged with the fee title and said deed of trust should be reconveyed of record. To avoid delays, please submit the original note, deed of trust and request for reconveyance to this office. After review of the requested information, the Company reserves the right to make additional requirements prior to the issuance of any policy of title insurance.

7. The requirement that  Detra Duncan     grantor(s) in the   in favor of   Tina L. Duncan
grantee(s) recorded     09/07/2005, Series No.  2005/385280   execute the Company's Affidavit of Grantor
before a Notary Public employed by this Company, for the purpose of
verifying the herein referred to instrument.

8. The current owner does NOT qualify for the $20.00 discount pursuant to the coordinated stipulated judgments entered in actions filed by both the Attorney General and private class action plaintiffs for the herein described property.

**END OF ITEMS**

**Note 1.** The only deeds affecting said land, which recorded within twenty-four (24) months of the date of this report, as are follows:

| | |
|---|---|
| Grantor: | Detra Duncan, an unmarried woman |
| Grantee: | Tina L. Duncan, an unmarried woman |
| Recorded: | September 7, 2005, Instrument No. 2005/385280, of Official Records |

**Note 2.** The following cities impose a property transfer tax for each $1,000.00 or fractional part based on full value, as follows:

| | |
|---|---|
| San Leandro: | $ 6.00 |
| Oakland: | $15.00 |
| Albany: | $11.50 |
| Alameda: | $ 5.40 |
| Piedmont: | $13.00 |
| Berkeley: | $15.00 |
| Hayward: | $ 4.50 |

**Note 3.** None of the items shown in this report will cause the Company to decline to attach CLTA Endorsement Form 100 to an Extended Coverage Loan Policy, when issued.

**Note 4.** The Company is not aware of any matters which would cause it to decline to attach the CLTA Endorsement Form 116 indicating that there is located on said land single family dwelling known as 10623 -10625 Graffin Street,, Oakland, CA to an Extended Coverage Loan Policy.

**Note 5.** **Your application** for title insurance was placed by reference to a street address only. Based on our records, we believe that the description in this report covers the parcel that you requested.

To prevent errors and to be certain that the proper parcel of land will appear on the documents and on the policy of title insurance, we require written approval of the legal description in this report be sent to this Company, signed by the parties to the transaction.

**Note 6.** Wiring instructions for Fidelity National Title Company, Oakland, CA, are as follows:

| | |
|---|---|
| Receiving Bank: | Bank of the West |
| | 1977 Saturn Street |
| | Monterey Park, CA 91755 |
| ABA Routing No.: | 121100782 |
| Credit Account Name: | Oakland Harrison |
| Credit Account No.: | 847003365 |
| Escrow No.: | 06-**161572**-LB |

These wiring instructions are for this specific transaction involving the Title Department of the Oakland office of Fidelity National Title Company. These instructions therefore should not be used in other transactions without first verifying the information with our accounting department. It is imperative that the wire text be exactly as indicated. Any extraneous information may cause unnecessary delays in confirming the receipt of funds.

**Note 7.** Section 12413.1, California Insurance Code became effective January 1, 1990. This legislation deals with the disbursement of funds deposited with any title entity acting in an escrow or subescrow capacity. The law requires that all funds be deposited and collected by the title entity's escrow and/or subescrow account prior to disbursement of any funds. Some methods of funding may subject funds to a holding period which must expire before any funds may be disbursed. In order to avoid any such delays, all funding should be done through wire transfer, certified check or checks drawn on California financial institutions.

**Note 8.** The charge where an order is canceled after the issuance of the report of title, will be that amount which in the opinion of the Company is proper compensation for the services rendered or the purpose for which the report is used, but in no event shall said charge be less than the minimum amount required under Section 12404.1 of the Insurance Code of the State of California. If the report cannot be canceled "no fee" pursuant to the provisions of said Insurance Code, then the minimum cancellation fee shall be that permitted by law.

**Note 9.**     California Revenue and Taxation Code Section 18662, effective January 1, 1994 and by amendment effective January 1, 2003, provides that the buyer in all sales of California Real Estate may be required to withhold 3 and 1/3% of the total sales price as California State Income Tax, subject to the various provisions of the law as therein contained.



# ATTACHMENT ONE

## AMERICAN LAND TITLE ASSOCIATION
### RESIDENTIAL TITLE INSURANCE POLICY (6-1-87) EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   * land use
   * improvements on the land
   * land division
   * environmental protection

   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at policy date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.

2. The right to take the land by condemning it, unless:
   * a notice of exercising the right appears in the public records on the Policy Date
   * the taking happened prior to the Policy Date and is binding on you if you bought the land without knowledge of the taking

3. Title Risks:
   * that are created, allowed, or agreed to by you
   * that are known to you, but not to us, on the Policy Date-unless they appeared in the public records
   * that result in no loss to you
   * that first affect your title after the Policy Date – this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks

4. Failure to pay value for your title.

5. Lack of a right:
   * to any land outside the area specifically described and referred to in Item 3 of Schedule A
   or
   * in streets, alleys, or waterways that touch your land

   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

In addition to the Exclusions, you are not insured against loss, costs, attorneys' fees, and the expenses resulting from:

1. Any rights, interests, or claims of parties in possession of the land not shown by the public records.

2. Any easements or liens not shown by the public records. This does not limit the lien coverage in Item 8 of Covered Title Risks.

3. Any facts about the land which a correct survey would disclose and which are not shown by the public records. This does not limit the forced removal coverage in item 12 of Covered Title Risks.

4. Any water rights or claims or title to water in or under the land, whether or not shown by the public records.

## CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

## SCHEDULE B, PART I
### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

### PART I

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

Case: 09-04166    Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 15 of 51

## ATTACHMENT ONE
### (CONTINUED)

**AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)**
**WITH A.L.T.A. ENDORSEMENT-FORM 1 COVERAGE**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or

(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

**AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;

(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

The above ALTA policy forms, dated 10-17-92, may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

Case: 09-04166    Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 16 of 51

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10-22-03)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10-22-03)**
**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. Land use
   d. improvements on Land
   e. Land division
   f. environmental protection
   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:
   a. notice of exercising the right appears in the Public Records at the Policy Date; or
   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date – this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1.00% of Policy Amount<br>or<br>$ 2,500.00<br>(whichever is less) | $ 10,000.00 |
| Covered Risk 15: | 1.00% of Policy Amount<br>or<br>$ 5,000.00<br>(whichever is less) | $ 25,000.00 |
| Covered Risk 16: | 1.00% of Policy Amount<br>or<br>$ 5,000.00<br>(whichever is less) | $ 25,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount<br>or<br>$ 2,500.00<br>(whichever is less) | $ 5,000.00 |

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a)  Any law, ordinance or governmental regulation (including but not limited to zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvements now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
   (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a)  created, suffered, assumed or agreed to by the Insured Claimant;
   (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c)  resulting in no loss damage to the Insured Claimant;

   (d)  attaching or created subsequent to Date of Policy (this paragraph does limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or
   (e)  resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.

6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.

7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.

8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:
   (a)  The time of the advance; or
   (b)  The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.

9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

# Notice

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do not have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company of the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you qualify for a discount.

<u>Fidelity National Title Group of Companies' Privacy Statement</u>

**July 1, 2001**

We recognize and respect the privacy expectations of today's consumers and the requirements of applicable federal and state privacy laws. We believe that making you aware of how we use your non-public personal information ("Personal Information"), and to whom it is disclosed, will form the basis for a relationship of trust between us and the public that we serve. This Privacy Statement provides that explanation. We reserve the right to change this Privacy Statement from time to time consistent with applicable privacy laws.

**In the course of our business, we may collect Personal Information about you from the following sources:**

- From applications or other forms we receive from you or your authorized representative;
- From your transactions with, or from the services being performed by, us, our affiliates, or others;
- From our internet web sites;
- From the public records maintained by governmental entities that we either obtain directly from those entities, or from our affiliates or others; and
- From consumer or other reporting agencies.

**Our Policies Regarding the Protection of the Confidentiality and Security of Your Personal Information**

We maintain physical, electronic and procedural safeguards to protect your Personal Information from unauthorized access or intrusion. We limit access to the Personal Information only to those employees who need such access in connection with providing products or services to you or for other legitimate business purposes.

**Our Policies and Practices Regarding the Sharing of Your Personal Information**

We may share your Personal Information with our affiliates, such as insurance companies, agents, and other real estate settlement service providers. We also may disclose your Personal Information:

- to agents, brokers or representatives to provide you with services you have requested;
- to third-party contractors or service providers who provide services or perform marketing or other functions on our behalf; and
- to others with whom we enter into joint marketing agreements for products or services that we believe you may find of interest.

In addition, we will disclose your Personal Information when you direct or give us permission, when we are required by law to do so, or when we suspect fraudulent or criminal activities. We also may disclose your Personal Information when otherwise permitted by applicable privacy laws such as, for example, when disclosure is needed to enforce our rights arising out of any agreement, transaction or relationship with you.

One of the important responsibilities of some of our affiliated companies is to record documents in the public domain. Such documents may contain your Personal Information.

**Right to Access Your Personal Information and Ability to Correct Errors or Request Changes or Deletion**

Certain states afford you the right to access your Personal Information and, under certain circumstances, to find out to whom your Personal Information has been disclosed. Also, certain states afford you the right to request correction, amendment or deletion of your Personal Information. We reserve the right, where permitted by law, to charge a reasonable fee to cover the costs incurred in responding to such requests.

All requests must be made in writing to the following address:

Fidelity National Title Group, Inc.
Privacy Compliance Officer
601 Riverside Avenue
Jacksonville, FL 32204

**Multiple Products or Services**

If we provide you with more than one financial product or service, you may receive more than one privacy notice from us. We apologize for any inconvenience this may cause you.

Privacy Statement (privacy) (11/05)

FINANCIAL TITLE COMPANY

Recording Requested By:
Ameriquest Mortgage Company

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Prepared By: Ameriquest Mortgage Company
Corinne Blackney
3120 W. March Lane, # 2B
Stockton, CA 95219

44072493-AEH



2006127052     03/31/2006 10:48 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:        78.00

23  PGS

[Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated March 27, 2006
together with all Riders to this document.
(B) "Borrower" is TINA L DUNCAN, An Unmarried Woman

Borrower's address is 334 EAST 21ST STREET, TRACY, CA 95376
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01
0148114242 -5625                                                   03/27/2006 3:31:43 PM

AMSCA (0207)

Page 1 of 15                    Initials: TD

VMP Mortgage Solutions - (800)521-7291

00000148114242030116160

EXHIBIT 2

Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 20 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 1 of 23
Order: duncan Comment:

Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is Town and Country Title Services, Inc.

(E) "Note" means the promissory note signed by Borrower and dated March 27, 2006
The Note states that Borrower owes Lender five hundred seventy-six thousand and 00/100                                                                              Dollars
(U.S. $ 576,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than April 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _Todd_

AM6CA (0207)                     Page 2 of 15                                      Form 3005  1/01

0148114242-5625

03/27/2006 3:31:43

0000014811424203011601602

Description: Alameda,CA Document-Year.DocID 2006:139652 Page: 2 of 15
Order: duncan Comment:

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of          **ALAMEDA**    :

        [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 045-5200-002             which currently has the address of

10623 & 10625 GRAFFIAN STREET                            [Street]

OAKLAND                   [City], California 94605     [Zip Code]

("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials: _____

AM6CA (0207)                    Page 3 of 15                           Form 3005   1/01

0148114242-5625

03/27/2006 3:31:43 PM

0000014811424202001161603

Case: 09-04166    Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 22 of 51

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 3 of 23
Order: duncan Comment:

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and

Initials: _TdP_

0148114242 - 5625

03/27/2006 3:31:43



0000014811424203011161604

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 4 of 23
Order: duncan Comment:

Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien

Initials: 

0148114242 - 5625

03/27/2006 3:31:43

0000014811424203011616605

Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 24 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 5 of 23
Order: duncan Comment:

which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration

0148114242 - 5625

03/27/2006 3:31:43



Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 25 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 6 of 23
Order: duncan Comment:

or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



AM6CA (0207)    Page 7 of 15    Initials: _____    Form 3005  1/01

0148114242 -5625

03/27/2006  3:31:43

0000014811424203011161607

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

AMSCA (0207)                     Page 8 of 15          Initials: _I R W_                Form 3005   1/01

0148114242 -5625

03/27/2006 3:31:43



0000014811424203011616608

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 8 of 23
Order: duncan Comment:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a

Initials: ___

0148114242-5625

03/27/2006 3:31:43


0000014811424203011811609

Case: 09-04166   Doc#1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 28 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 9 of 23
Order: duncan Comment:

rating that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless

Initials: _TdL_

0148114242 - 5625

03/27/2006 3:31:43



0000014811424203011618190

Case: 09-04166   Doc#.1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 29 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 10 of 23
Order: duncan Comment:

Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement

AM6CA (0207)    Page 11 of 16    Initials: _TAL_    Form 3005  1/01

0148114242 - 5625

03/27/2006 3:31:43



00001481142420301161611

Case: 09-04166    Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 30 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 11 of 23
Order: duncan Comment:

by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0148114242 - 5625

03/27/2006 3:31:43

00000148114242030116 1612

Case: 09-04166 . Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 31 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 12 of 23
Order: duncan Comment:

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

AM6CA (0207)          Page 13 of 15          Initials: ___          Form 3005   1/01

0148114242 - 5625

03/27/2006  3:31:43



00000148114242030116161 3

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_David W. Ellis, Notary Public_           _____ (Seal)
                                            TINA L DUNCAN            -Borrower

_____             _____ (Seal)
                                                                     -Borrower

_____ (Seal)      _____ (Seal)
                     -Borrower                                       -Borrower

_____ (Seal)      _____ (Seal)
                     -Borrower                                       -Borrower

_____ (Seal)      _____ (Seal)
                     -Borrower                                       -Borrower

0148114242 - 5625

03/27/2006 3:31:43 PM

0000014811424203011161614

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 14 of 23
Order: duncan Comment:

State of California

County of San Joaquin } ss:

On 28/03/06 before me, David W. Ellis, a Notary Public
<u>Day/Month/Year</u>                              <u>Notary Public</u>

personally appeared Tina L. Duncan

~~personally known to me~~ (or proven to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument

Witness my hand and official seal.


<u>Notary Public</u>                                        (Seal)



DAVID W. ELLIS
Commission # 1529836
Notary Public - California
San Joaquin County
My Comm. Expires Nov 26, 2008

00000148114242030116161616

400-15CA (4/02)                    Page 15 of 15        0148114242 - 5625

03/27/2006 3:31:43 PM

Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 34 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 15 of 23
Order: duncan Comment:

# Legal Description

## Exhibit "A"

Lot 315, Map of Stone Orchard, Stonehurst, in the City of Oakland, County of Alameda, State of California, 1908, filed for recorded March 3, 1908, Alameda County Records.

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 16 of 23
Order: duncan Comment:

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 27th day of March , 2006  and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

### 10623 & 10625 GRAFFIAN STREET, OAKLAND, CA  94605
[Property Address]

### THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of  9.100 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

### 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(A) Change Dates**
The interest rate I will pay may change on the first day of  April, 2008  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials _____

Loan Number: 0148114242 - 5625

0000014811424203021503D1

Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 36 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 17 of 23
Order: duncan Comment:

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six** percentage points ( **6.000** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.100%** or less than **9.100%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One( 1.000** %) from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 15.100)% or less than 9.100)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials _____ 

Loan Number: 0148114242 - 5625

Case: 09-04166    Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 37 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 18 of 23
Order: duncan Comment:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

 _____ (Seal)          _____ (Seal)
Borrower TINA L DUNCAN                                    Borrower


_____ (Seal)          _____ (Seal)
Borrower                                                 Borrower


Loan Number: 0148114242 - 5625


0000014811424203021S0303

610-3 (Rev 1/01)                         Page 3 of 3                        03/27/2006 3:31:43 PM

Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 38 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 19 of 23
Order: duncan Comment:

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 27th day of March, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to Ameriquest Mortgage Company

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
10623 & 10625 GRAFFIAN STREET, OAKLAND, CA 94605

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

0149114242

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials:
Page 1 of 4                                                                 Form 3170 1/01
-57R (0008)                    VMP MORTGAGE FORMS - (800)521-7291    03/27/2006 3:31:43 PM

00000148114242032210401

Case: 09-04166   Doc# 1   Filed: 04/06/09   Entered: 04/06/09 10:15:02   Page 39 of 51
Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 20 of 23
Order: duncan Comment:

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

<span>03/27/2006 3:31:43 PM</span>
<span>0148314242</span>

Initials: _____

Form 3170 1/01

-57R (0008)

Page 2 of 4

0000014811424203022I0402

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 21 of 23
Order: duncan Comment:

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

03/27/2006 3:31:43 PM

0049114242

Initials: _____

-57R (0008)                     Page 3 of 4                     Form 3170 1/01

0000014871142020302210403

Description: Alameda,CA Document-Year.DocID 2006.127052 Page: 22 of 23
Order: duncan Comment:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
TINA L DUNCAN          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

0148114242

-57R (0008)                    Page 4 of 4                    Form 3170 1/01

                                              03/27/2006 3:31:43 PM


0000014811424203022104042

# Fidelity National Title Company

1999 Harrison Street, Suite 675, Oakland, CA 94612
510 893-8100 • FAX 510 893-8151

## BORROWER'S ESCROW INSTRUCTIONS

Date: April 18, 2006
Escrow No.: 06-**161572**-LB
Locate No.: CAFNT0901-0901-0013-0000161572
Escrow Officer: Linda Barnett

I/We hand you herewith:
- Executed loan documents (new loan)
- Balance of funds to close escrow in the form of wire transfer, certified check, cashier's check or teller's check payable to Fidelity National Title Company pursuant to the "Deposit of Funds," Paragraph 1 contained in the General Provisions attached hereto and made a part hereof
- Approved copy of Preliminary Report

You are authorized to deliver and/or record the above and close in accordance with the estimated closing statement contained herein (subject to adjustment);

and when you can procure/issue a **06-ALTA Loan w/Form 1 - 1992** coverage form Policy of Title Insurance from **Fidelity National Title Insurance Company** with a liability of **$612,000.00** on the property described in your Preliminary Report No. 161572, dated February 20, 2006, a copy of which I/we have read and hereby approve.

SHOWING TITLE VESTED IN:
Tina L. Duncan, an unmarried woman

FREE FROM ENCUMBRANCES EXCEPT:
1.  Current general and special taxes for the fiscal year in which this escrow closes, and taxes for the ensuing year, if any, a lien not yet due and payable;
2.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California;
3.  Bonds and Assessments with no delinquent payments, if any;
4.  Covenants, conditions, restrictions, reservations, easements and rights of way now of record, if any;
5.  Exceptions numbered sho 1,3,8 inclusive as shown in your preliminary report above-referenced.
6.  A First Deed of Trust, to record, securing a note for $612,000.00 in favor of SRI Mortgage.

BORROWER STATES THAT PROPERTY ADDRESS IS:
**10623 -10625 Graffin Street, Oakland, CA 94603**

ADDITIONAL INSTRUCTIONS:
1.  The items indicated by "P.O.C." or "PAID" or "*" are included at the direction of the Lender for disclosure purposes only. The Escrow Holder/Settlement Agent has no knowledge of these expenditures, except as provided by the Lender. They have not and cannot be verified as to the amount, the payee, nor actual payment and no liability is assumed by the closing agent as to the validity and/or sufficiency thereof.

2.  Borrower is aware the new loan may be funded at least one day prior to the date of recordation of documents and close of escrow and that interest will commence on said loan as of the date of funding. Should escrow close after a weekend or holiday, Borrower is aware that interest will be charged during such weekend or holiday and Borrower agrees to bear the cost of said interest and will hold Escrow Holder harmless in connection therewith.

3.  Borrower agrees to provide new hazard insurance policy acceptable to lender and to authorize payment of premium through escrow unless a paid receipt is provided to escrow.

4.  The undersigned hereby authorize and instruct Escrow Holder to charge each party to the escrow for their respective Federal Express, special mail handling/courier and/or incoming/outgoing wire transfer fees. Unless specified in writing by the undersigned, Escrow Holder is authorized to select special mail/delivery or courier service to be used.

5.  Borrower is aware that interest on the existing loan(s) does not stop accruing at close of escrow, but continues until the actual day of receipt of the payoff by Lender.

    Borrower is aware that interest will accrue through weekends or holidays.

Continued on Following Page
(nlins14)(07-05)

Borrower is aware he/she/they are responsible for payment of all of such interest and will indemnify and hold Escrow Holder harmless in connection with the payment of such interest.

6.    **FACSIMILE SIGNATURE:** Escrow Holder is hereby authorized and instructed that, in the event any party utilizes "facsimile" transmitted signed documents or instructions to Escrow Holder, you are to rely on the same for all escrow instruction purposes and the closing of escrow as if they bore original signatures. Each party shall provide to the other party and to Escrow Holder, within 72 hours after transmission, duplicate original documents or instructions bearing the original signatures. Not withstanding the foregoing, any and all escrow instructions pertaining to the release or disbursement of funds from escrow prior to close of escrow shall not be effective until Escrow Holder has received such instructions from all parties bearing original signatures. Each party further acknowledges and agrees that documents with non-original signatures may not be accepted for recording by the County Recorder, therefore no closing or recording may take place without the submission of the original documents.

7.    **GOOD FUNDS-DISBURSE WHEN AVAILABLE:** Borrower authorize and instruct Fidelity National Title Company to record all documents required in this escrow when all the conditions of this escrow have been met and upon receipt and deposit of all funds necessary to consummate this transaction in the form of a cashier's check, teller's check or certified check regardless of whether the funds are available for disbursement in accordance with Reg. CC. Immediately upon availability of the deposited instrument, Fidelity National Title Company is instructed to disburse all funds in accordance with these instructions and/or the attached estimated closing statement.

8.    **INSURANCE:** Borrower/Buyer hereby agrees to provide escrow with an evidence of insurance, in compliance with the Lender's Instructions.

Insurance Company: _Farmers Insurance_

Agents Name: _John Bell_

Telephone Number: _510-832-1005_           _258-9000_

Any additional coverage desired by Buyer shall be handled outside of this escrow and will be no concern to Escrow Holder whatsoever.

## ESTIMATED CLOSING STATEMENT

**CLOSING DATE:** April 27, 2006

|  | $ DEBITS | $ CREDITS |
|---|---|---|
| **FINANCIAL:** | | |
| New 1st Trust Deed to SRI Mortgage | | 612,000.00 |
| | | |
| **TITLE CHARGES:** | | |
| 06-ALTA Loan w/Form 1 - 1992 for $612,000.00 | 1,300.00 | |
| Endorsement Fee(s) | 25.00 | |
| Recording Trust Deed(s) | 90.00 | |
| | | |
| **ESCROW CHARGES:** | | |
| Escrow Fee to Fidelity National Title | 712.00 | |
| Doc Prep Fees to Fidelity National Title | 150.00 | |
| Overnight Delivery Fee | 30.00 | |
| Outside Courier/Special Messenger | 35.00 | |
| Notary Fees | 150.00 | |
| | | |
| **NEW LOAN CHARGES – SRI Mortgage** | | |
| **Total Loan Charges: $19,200.98** | | |
| Origination Fee @ 2.500% plus $0.00 to Equiprime Group | 15,300.00 | |
| Appraisal Fee to Equiprime Group | 375.00 | |
| Credit Report to Equiprime Group | 14.00 | |
| Processing Fee to Equiprime Group | 1,600.00 | |
| Underwriting Fee to SRI Mortgage | 995.00 | |
| Interest at $152.83 per day from 4/25/2006 to 5/1/2006 to SRI Mortgage | 916.98 | |
| | | |
| **PAYOFFS - Chase Home Finance LLC** | | |
| **Total Payoff $505,221.54** | | |
| Principal Balance to Chase Home Finance LLC | 484,889.23 | |
| Interest to 05/03/2006 | 6,054.33 | |
| Forwarding/Demand Fee to Chase Home Finance LLC | 30.00 | |
| Late Charges to Chase Home Finance LLC | 199.74 | |
| Prepayment Penalty to Chase Home Finance LLC | 14,039.24 | |
| Recording Fee to Chase Home Finance LLC | 9.00 | |
| | | |
| **MISCELLANEOUS:** | | |
| **TBD** ESTIMATE- pls provide info!! for Hazard Insurance | 450.00 | |
| | | |
| ESTIMATED REFUND DUE BORROWER | $84,635.48 | |
| | | |
| ESTIMATED TOTALS | $612,000.00 | $612,000.00 |

The Undersigned hereby instruct and authorize Escrow Holder to disburse proceeds/refund as follows:

[ ]  TRANSFER          [ ] All Net Proceeds,  or  [ ] $_____
       TO:                    _____
       ATTN:                  _____
       ESCROW NO:             _____

[ ]  HOLD check for PICK UP
[ ]  CALL when check is ready for PICK UP, PHONE NUMBER _____
[X]  WIRE funds to (Bank Name)   *Patelco Credit Union*
       Address:      *156 Second Street*
       Routing No.:  *3210 76470*
       Account No.:  *129687-00*

[ ]  MAIL      [ ] FEDERAL EXPRESS check to _____

_____
Tina L. Duncan

# GENERAL PROVISIONS

**1. DEPOSIT OF FUNDS**

The law dealing with the disbursement of funds requires that all funds be available for withdrawal as a matter of right by the title entity's escrow and/or sub escrow account prior to disbursement of any funds. Only cash or wire-transferred funds can be given immediate availability upon deposit. Cashier's checks, teller's checks and Certified checks may be available one business day after deposit. All other funds such as personal, corporate or partnership checks and drafts are subject to mandatory holding periods which may cause material delays in disbursement of funds in this escrow. In order to avoid delays, all fundings should be wire transferred. Outgoing wire transfers will not be authorized until confirmation of the respective incoming wire transfer or of availability of deposited checks.

All funds received in this escrow shall be deposited with other escrow funds in a general escrow account or accounts of Fidelity National Title Company, with any state or national bank, or savings and loan association (the "depository Institution") and may be transferred to any other such general escrow account or accounts. The parties to this escrow acknowledge that the maintenance of such escrow accounts with some depository institutions may result in Escrow Holder's being provided with an array of bank services, accommodations or other benefits by the depository Institution. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository Institution. All such services, accommodations and other benefits shall accrue to Escrow Holder and Escrow Holder shall have no obligation to account to the parties to this escrow for the value of such services, accommodations or other benefits.

Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest-bearing account. All disbursements shall be made by check of Fidelity National Title Company. The principals to this escrow are hereby notified that the funds deposited herein are insured only to the limit provided by the Federal Deposit Insurance Corporation. Any instruction for bank wire will provide reasonable time or notice for Escrow Holder's compliance with such instruction. Escrow Holder's sole duty and responsibility shall be to place said wire transfer instructions with its wiring bank upon confirmation of (1) satisfaction of conditions precedent or (2) document recordation at close of escrow. Escrow Holder will NOT be held responsible for lost interest due to wire delays caused by any bank or the Federal Reserve System, and recommends that all parties make themselves aware of banking regulations with regard to placement of wires.

In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed for the day, the parties agree to provide written instructions for an alternative method of disbursement. WITHOUT AN ALTERNATIVE DISBURSEMENT INSTRUCTION, FUNDS WILL BE HELD IN TRUST IN A NON-INTEREST BEARING ACCOUNT UNTIL THE NEXT OPPORTUNITY FOR WIRE PLACEMENT.

**2. PRORATIONS AND ADJUSTMENTS**

All prorations and/or adjustments called for in this escrow are to be made on the basis of a thirty (30) day month unless otherwise instructed in writing. You are to use information contained on last available tax statement, rental statement as provided by the Seller, beneficiary's statement and fire insurance policy delivered into escrow for the prorations provided for herein.

**3. SUPPLEMENTAL TAXES**

The within described property may be subject to supplemental real property taxes due to the change of ownership taking place through this escrow. Any supplemental real property taxes arising as a result of the transfer of the property to Buyer shall be the sole responsibility of Buyer and any supplemental real property taxes arising prior to the closing date shall be the sole responsibility of the Seller. TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER.

**4. UTILITIES/POSSESSION**

Transfer of utilities and possession of the premises are to be settled by the parties directly and outside escrow.

**5. PREPARATION AND RECORDATION OF INSTRUMENTS**

Escrow Holder is authorized to prepare, obtain, record and deliver the necessary instruments to carry out the terms and conditions of this escrow and to order the policy of title insurance to be issued at close of escrow as called for in these instructions. Close of escrow shall mean the date instruments are recorded.

**6. AUTHORIZATION TO FURNISH COPIES**

You are authorized to furnish copies of these instructions, supplements, amendments, notices of cancellation and closing statements, to the Real Estate Broker(s) and Lender(s) named in this escrow.

**7. RIGHT OF CANCELLATION**

Any principal instructing you to cancel this escrow shall file notice of cancellation in your office in writing. You shall, within two (2) working days thereafter, deliver, one copy of such notice to each of the other principals at the addresses stated in this escrow. UNLESS WRITTEN OBJECTION TO CANCELLATION IS FILED IN YOUR OFFICE BY A PRINCIPAL WITHIN TEN (10) DAYS AFTER DATE OF SUCH MAILING, YOU ARE AUTHORIZED TO COMPLY WITH SUCH NOTICE AND DEMAND PAYMENT OF YOUR CANCELLATION CHARGES. If written objection is filed, you are authorized to hold all money and instruments in this escrow and take no further action until otherwise directed, either by the principals' mutual written instructions or by final order of a court of competent jurisdiction.

**8. PERSONAL PROPERTY**

No examination or insurance as to the amount or payment of personal property taxes is required unless specifically requested.

By signing these General Provisions, the parties to the escrow hereby acknowledge that they are transferring the Escrow Holder against any and all matters relating to any "Bulk Sales" requirements, and instruct Escrow Agent to proceed with the closing of escrow without any consideration of matter of any nature whatsoever regarding "Bulk Sales" being handled through escrow.

**9. RIGHT OF RESIGNATION**

Escrow Holder has the right to resign upon ten (10) days written notice delivered to the principals herein. If such right is exercised, all funds and documents shall be returned to the party who deposited them and Escrow Holder shall have no liability hereunder.

**10. AUTHORIZATION TO EXECUTE ASSIGNMENT OF HAZARD INSURANCE POLICIES**

Either Buyer, Seller and/or Lender may hand you the insurance agent's name and insurance policy information, and you are to execute, on behalf of the principals hereto, form assignments of interest in any insurance policy (other than title insurance) called for in this escrow, forward assignment and policy to the insurance agent, requesting that the insurer consent to such transfer and/or attach a loss payable clause and/or such other endorsements as may be required, and forward such policy(s) to the principals entitled thereto. It is not your responsibility to verify the information handed you or the assignability of said insurance. Your sole duty is to forward said request to insurance agent at close of escrow.

Further, there shall be no responsibility upon the part of Escrow Holder to renew hazard insurance policy(s) upon expiration or otherwise keep it in force either during or subsequent to the close of escrow. Cancellation of any existing hazard insurance policies is to be handled directly by the principals, and outside of escrow.

**11. ACTION IN INTERPLEADER**

The principals hereto expressly agree that you, as Escrow Holder, have the absolute right at your election to file an action in interpleader requiring the principals to answer and litigate their several claims and rights among themselves and you are authorized to deposit with the clerk of the court all documents and funds held in this escrow. In the event such action is filed, the principals jointly and severally agree to pay your cancellation charges and costs, expenses and reasonable attorney's fees which you are required to expend or incur in such interpleader action, the amount thereof to be fixed and judgment therefore to be rendered by the court. Upon the filing of such action, you shall thereupon be fully released and discharged from all obligations imposed by the terms of this escrow or otherwise.

**12. TERMINATION OF AGENCY OBLIGATION**

If there is no action taken on this escrow within six (6) months after the "time limit date" as set forth in the escrow instructions or written extension thereof, your agency obligation shall terminate at your option and all documents, monies or other items held by you shall be returned to the parties depositing same. In the event of cancellation of this escrow, whether it be at the request of any of the principals or otherwise, the fees and charges due Fidelity National Title Company, including expenditures incurred and/or authorized shall be borne equally by the parties hereto (unless otherwise agreed to specifically).

**13. CONFLICTING INSTRUCTIONS**

Upon receipt of any conflicting instructions, you are to take no action in connection with this escrow until non-conflicting instructions are received from all of the principals to this escrow (subject to sections 7, 9, 11 and 12 above).

**14. REIMBURSEMENT ATTORNEY FEES/ESCROW HOLDER**

In the event that a suit is brought by any party or parties to these escrow instructions to which the Escrow Holder is named as a party which results in a judgment in favor of the Escrow Holder and against a principal or principals herein, the principals or principals' agent agrees to pay said Escrow Holder all costs, expenses and reasonable attorney's fees which it may expend or incur in said suit, the amount thereof to be fixed and judgment therefore to be rendered by the court in said suit.

**15. DELIVERY/RECEIPT**

Delivery to principals as used in these instructions unless otherwise stated herein is to be by regular mail, and receipt is determined to be 72 hours after such mailing. All documents, balances and statements due to the undersigned are to be mailed to the address shown herein. All notices, change of instructions, communications and documents are to be delivered in writing to the office of Fidelity National Title Company as set forth herein.

**16. STATE/FEDERAL CODE NOTIFICATIONS**

According to Federal Law, the Seller, when applicable, will be required to complete a sales activity report that will be utilized to generate a 1099 statement to the Internal Revenue Service.

Pursuant to State Law, prior to the close of escrow, Buyer will provide Escrow Holder with a Preliminary Change of Ownership Report. In the event said report is not handed to Escrow Holder for submission to the County in which subject property is located, upon recording of the Grant Deed, Buyers acknowledge that the applicable fee will be assessed by said County and Escrow Holder shall debit the account of Buyer for same at close of escrow.

Buyer and Seller herein represent and warrant that they will seek independent legal and tax advice relative to their obligations under the "Foreign Investors In Real Property Act", and any

Case: 09-04166

Initials: _TolD._

other applicable federal and/or state laws regarding same, and will take all steps necessary in order to comply with such requirements and hereby hold you harmless relative to their compliance therewith.

**17. ENCUMBRANCES**

Escrow Holder is to act upon any statements furnished by a lienholder or his agent without liability or responsibility for the accuracy of such statements. Any adjustments necessary because of a discrepancy between the information furnished Escrow Holder and any amount later determined to be correct shall be settled between the parties direct and outside of escrow.

You are authorized, without the need for further approval, to debit my account for any fees and charges that I have agreed to pay in connection with this escrow, and for any amounts that I am obligated to pay to the holder of any lien or encumbrance to establish the title as insured by the policy of title insurance called for in these instructions. If for any reason my account is not debited for such amounts at the time of closing, I agree to pay them immediately upon demand, or to reimburse any other person or entity who has paid them.

**18. ENVIRONMENTAL ISSUES**

Fidelity National Title Company has made no investigation concerning said property as to environmental/toxic waste issues. Any due diligence required or needed to determine environmental impact as to forms of toxification, if applicable, will be done directly and by principals outside of escrow. Fidelity National Title Company is released of any responsibility and/or liability in connection therewith.

**19. USURY**

Escrow Holder is not to be concerned with any questions of usury in any loan or encumbrance involved in the processing of this escrow and is hereby released of any responsibility or liability therefore.

**20. DISCLOSURE**

Escrow Holder's knowledge of matters affecting the property, provided such facts do not prevent compliance with these instructions, does not create any liability or duty in addition to these instructions.

**21. FACSIMILE SIGNATURE**

Escrow Holder is hereby authorized and instructed that, in the event any party utilizes "facsimile" transmitted signed documents or instructions to Escrow Holder, you are to rely on the same for all escrow instruction purposes and the closing of escrow as if they bore original signatures. Each party shall make every effort to provide to the other party and to Escrow Holder, within 72 hours after transmission, duplicate original documents or instructions bearing the original signatures. Each party further acknowledges and agrees that documents with non-original signatures may not be accepted for recording by the County Recorder, therefore no closing or recording may take place without the submission of the original documents.

**22. CLARIFICATION OF DUTIES**

Fidelity National Title Company serves ONLY as an Escrow Holder in connection with these instructions and cannot give legal advice to any party hereto.

Escrow Holder is not to be held accountable or liable for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same. Escrow Holder's duties hereunder shall be limited to the proper handling of such money and the proper safekeeping of such instruments, or other documents received by Escrow Holder, and for the disposition of same in accordance with the written instructions accepted by Escrow Holder.

The agency and duties of Escrow Holder commence only upon receipt of copies of these Escrow Instructions executed by all parties.

THIS AGREEMENT IN ALL PARTS APPLIES TO, INURES TO THE BENEFIT OF, AND BINDS ALL PARTIES HERETO, THEIR HEIRS, LEGATEES, DEVISEES, ADMINISTRATORS, EXECUTORS, SUCCESSORS AND ASSIGNS, AND WHENEVER THE CONTEXT SO REQUIRES THE MASCULINE GENDER INCLUDES THE FEMININE AND NEUTER, AND THE SINGULAR NUMBER INCLUDES THE PLURAL. THESE INSTRUCTIONS AND ANY OTHER AMENDMENTS MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH SHALL BE CONSIDERED AS AN ORIGINAL AND BE EFFECTIVE AS SUCH.

MY SIGNATURE HERETO CONSTITUTES INSTRUCTION TO ESCROW HOLDER OF ALL TERMS AND CONDITIONS CONTAINED IN THIS AND ALL PRECEDING PAGES AND FURTHER SIGNIFIES THAT I HAVE READ AND UNDERSTAND THESE GENERAL PROVISIONS.

**Fidelity National Title Company conducts escrow business under a Certificate of Authority No. 2597-3 issued by the California Department of Insurance.**

Tina L. Duncan

RECEIVED BY: Fidelity National Title Company

BY: _____

DATE: _____

**July 1, 2001**

We recognize and respect the privacy expectations of today's consumers and the requirements of applicable federal and state privacy laws. We believe that making you aware of how we use your non-public personal information ("Personal Information"), and to whom it is disclosed, will form the basis for a relationship of trust between us and the public that we serve. This Privacy Statement provides that explanation. We reserve the right to change this Privacy Statement from time to time consistent with applicable privacy laws.

**In the course of our business, we may collect Personal Information about you from the following sources:**

- From applications or other forms we receive from you or your authorized representative;
- From your transactions with, or from the services being performed by, us, our affiliates, or others;
- From our internet web sites;
- From the public records maintained by governmental entities that we either obtain directly from those entities, or from our affiliates or others; and
- From consumer or other reporting agencies.

**Our Policies Regarding the Protection of the Confidentiality and Security of Your Personal Information**

We maintain physical, electronic and procedural safeguards to protect your Personal Information from unauthorized access or intrusion. We limit access to the Personal Information only to those employees who need such access in connection with providing products or services to you or for other legitimate business purposes.

**Our Policies and Practices Regarding the Sharing of Your Personal Information**

We may share your Personal Information with our affiliates, such as insurance companies, agents, and other real estate settlement service providers. We also may disclose your Personal Information:
- to agents, brokers or representatives to provide you with services you have requested;
- to third-party contractors or service providers who provide services or perform marketing or other functions on our behalf; and
- to others with whom we enter into joint marketing agreements for products or services that we believe you may find of interest.

In addition, we will disclose your Personal Information when you direct or give us permission, when we are required by law to do so, or when we suspect fraudulent or criminal activities. We also may disclose your Personal Information when otherwise permitted by applicable privacy laws such as, for example, when disclosure is needed to enforce our rights arising out of any agreement, transaction or relationship with you.

One of the important responsibilities of some of our affiliated companies is to record documents in the public domain. Such documents may contain your Personal Information.

**Right to Access Your Personal Information and Ability to Correct Errors or Request Changes or Deletion**

Certain states afford you the right to access your Personal Information and, under certain circumstances, to find out to whom your Personal Information has been disclosed. Also, certain states afford you the right to request correction, amendment or deletion of your Personal Information. We reserve the right, where permitted by law, to charge a reasonable fee to cover the costs incurred in responding to such requests.

All requests must be made in writing to the following address:

Fidelity National Title Group, Inc.
Privacy Compliance Officer
601 Riverside Avenue
Jacksonville, FL 32204

**Multiple Products or Services**

If we provide you with more than one financial product or service, you may receive more than one privacy notice from us. We apologize for any inconvenience this may cause you.

Case: 09-04166    Doc# 1    Filed: 04/06/09    Entered: 04/06/09 10:15:02    Page 49 of 51

Privacy Statement (privacy) (11/05)

# Fidelity National Title Company
## FNT Alameda – Oakland Harrison
### WIRE OUT REQUEST

| Cost Center | Profit Center | Escrow No. | Title No. | Date | Instrument No. |
|---|---|---|---|---|---|
| 0901 | 0013 | 0000161572 | 0000161572 | 5/2/2006 | 1310031421 |

| Bank Code | Bank Name | | | Account No. | |
|---|---|---|---|---|---|
| 0010 | Bank of the West | | | 847003365 | |

**Wire Transfer Source:**

> BANK#: 0010
> BANK NAME: Bank of the West
> **ACCOUNT #: 847003365**

**Wire Transfer Destination:**

> BANK NAME: Patelco Credit Union
> ADDRESS:
>
> ABA ROUTING #: 321076470
> CREDIT ACCOUNT NAME: Tina Duncan
> CREDIT ACCOUNT NUMBER: 12968701
> ADDITIONAL INSTRUCTIONS: Escrow Proceeds

**AMOUNT: $-505,221.54**

**PLEASE ATTACH A COPY OF YOUR CHECK REGISTER WITH THIS REQUEST FOR WIRE.**

_____      _____
AUTHORIZED SIGNATURE      AUTHORIZED SIGNATURE

POSTED BY: _____
     Terry Guice

---

Operational Accounting Use Only

| WIRE RELEASE | VERIFICATION |
|---|---|
| Bank Contact: _____ TIME: _____ | TIME: _____ |
| Account No.: _____ DATE: _____ | DATE: _____ |
| Test Code: _____ | Name of Authorized Person: _____ |
| Sequence/Reference: _____ | Wire Verifier Signature: _____ |
| Releaser Signature: _____ | |

File Copy

4

# Fidelity National Title Co.

**10151949**

| VENDOR NO. | 64290 | NAME: | CITIRESIDENTIAL | | | CHECK DATE: | 12/11/2008 | |

| REFERENCE | INV. DATE | CLAIM NUMBER | | GROSS AMOUNT | DISCOUNT TAKEN | NET AMOUNT PAID |
|---|---|---|---|---|---|---|
| TR501010 | 12/11/2008 | 288937 | | 604,114.99 | 0.00 | 604,114.99 |
| | | | | | | |
| | | | TOTAL > | 604,114.99 | 0.00 | 604,114.99 |

---

THIS CHECK IS VOID WITHOUT A BLUE & RED BACKGROUND AND A TRUE WATERMARK - HOLD UP TO THE LIGHT TO VERIFY

**Fidelity National Title Co.**
601 Riverside Avenue
Bldg. 5, 4th Floor
Jacksonville, FL 32204 (904)357-1353

Harris Trust and Savings Bank
Roselle, IL
70-1558/719

**10151949**

DATE 12/11/2008

AMOUNT ***604,114.99

PAY   Six Hundred Four Thousand One Hundred Fourteen  and 99/100******

TO THE   CITIRESIDENTIAL

ORDER
OF

CHECK IS PRINTED ON SECURITY PAPER WHICH INCLUDES A MICROPRINT BORDER & FLUORESCENT FIBERS

⑈10151949⑈ ⑆071915580⑆ 04⑈258⑈069⑈4⑈ ⑈0060411499⑈